Jane ROE, Plaintiff–Appellee,

v.

Dr. David JEFFERSON, Defendant–Appellant.

Supreme Court of Tennessee,
at Nashville.

March 21, 1994.

Rehearing Denied May 9, 1994.

Douglas S. Johnston, Jr., Nashville, for plaintiff-appellee.

C. Bennett Harrison, Jr., Cornelius & Collins, Nashville, for defendant-appellant.

## OPINION

DROWOTA, Justice.

The defendant, Dr. David Jefferson, appeals from the Court of Appeals' reversal of the summary judgment entered by the trial court in his favor in this medical malpractice case. The issue for our determination is whether the plaintiff Jane Roe's action is barred by the statute of limitations for medical malpractice actions, Tenn.Code Ann. § 29–26–116, under the facts of this case.

## THE FACTS

In the summer of 1984 Jane Roe was advised by her physician, Dr. Jones Moore, to seek psychological help because he was unable to cure several long-standing physical ailments from which she suffered. Roe chose Dr. David Jefferson from a group of mental health professionals that Dr. Moore had recommended, and Roe and Jefferson began a therapist-patient relationship in August 1984. During the first sessions Roe revealed to Dr. Jefferson that she had been the victim of a violent rape in 1972. Roe also told Dr. Jefferson that she was experiencing some difficulty in her marriage. Dr. Jefferson diagnosed Roe as suffering from "adjustment disorder with mixed emotional features." This disorder generally means that the patient is not adjusting well and is under a great deal of stress; it is recognized as a legitimate psychiatric disorder by the American Psychiatric Association. Dr. Jefferson testified that this initial phase of treatment continued until March 1986, when the treatment was concluded by mutual consent. It was Dr. Jefferson's policy to have the patient write a letter evaluating the treatment to the referring physician at this point, and Dr. Jefferson would normally write a separate letter to the referring physician confirming the termination. This procedure was followed, but it is apparent from the record that Roe continued her visits to Dr. Jefferson on

a regular basis; and Dr. Jefferson's records indicate that the visits continued through October 1987. Furthermore, the plaintiff testified in her deposition that there never was a clear-cut termination of treatment.

The plaintiff alleges in her complaint and states in her deposition that Dr. Jefferson began "sexualizing" the therapist-patient relationship in early 1987 when he began hugging her at the conclusion of the sessions. At some point during that period Dr. Jefferson confided to Roe that he had not been sleeping with his wife for five years. In July and August of 1987 Dr. Jefferson engaged in sexual touching with Roe in his office. These incidents escalated into a full-blown sexual affair which began in November 1987; this affair continued virtually unabated until February 24, 1989. During this period, Roe and Dr. Jefferson engaged in sex in Jefferson's office, in his car, and in a motel in Davidson County.

In early 1988 Dr. Jefferson informed Roe that he was being investigated by the Tennessee Board of Examiners in Psychology regarding potential ethical violations in connection with a sexual relationship he had had with a patient in 1979. It is undisputed that Roe knew that Dr. Jefferson could lose his professional license because of this conduct. Roe testified, however, that Dr. Jefferson told her repeatedly that their relationship was different than the relationship for which he was being investigated, that he loved her, and that sex with patients was not unethical in every case. Dr. Jefferson also informed Roe in February 1988 that he was seeing other women. Roe testified that her relationship with Dr. Jefferson became rocky as 1988 progressed: she stated that she began to feel guilty about committing adultery and that she also began to resent the fact that Dr. Jefferson had so little time to spend with her. Roe also stated that Dr. Jefferson became paranoid that she would inform the Board of their relationship, and that he would often erupt and mentally abuse her because of this fear. Roe testified that she began to feel used and that she ceased to trust Dr. Jefferson as the year went on. She stated that although she realized that Dr.

Jefferson was hurting her, she seemed unable to get away from him.

Because of this distrust, Roe called the Board to confirm if Dr. Jefferson had in fact been charged with any ethical violations. She spoke to a Board employee on the telephone, who confirmed that Dr. Jefferson had been charged; this employee also informed Roe that another psychologist, Dr. Richard McGee, had been charged with violating the same Board rules. Because she was afraid of being eventually called before the Board to testify, Roe attended the Board hearing concerning Dr. McGee for approximately 60 to 90 minutes. While in attendance, Roe took notes of the proceedings. At her deposition she was questioned at length about these notes, and a portion of this testimony is as follows:

Q. Let's drop down to the notation you make "look beyond sanctions, everyone has shadows, get in hell of a mess, face consequences." To what does that refer?

A. I think that was what he [Dr. Thomas, the expert witness at the hearing] was saying about Dr. McGee, that he felt this happened to a lot of people, and he could have a conditional license until they thought that he was capable of having his license back. Conditional as not having women patients.

Q. The hell of a mess that he is talking about, is that the situation that he felt Dr. McGee was in because of his indiscretions with his patients?

A. Yes.

Q. And what were some of the consequences that Dr. Thomas said he had to face?

A. Well, Dr. Thomas was just saying that you can easily get into a hell of a mess before you realize that you'd done it, and when you do realize, you've got to face the consequences.

Q. Did he go on to elaborate what some of those consequences were?

A. I don't recall.

Q. You have got "conditional license" and then a "lawsuit."

A. Some of those things I wrote because I thought people were turning around and

staring at me and I just wanted to be doing something.

Q. Were two of the consequences that Dr. Thomas pointed out that you might face for being in this, in quote, a hell of a mess, were being on a conditional license or facing a lawsuit?

A. I don't recall why I have lawsuit written there. They did say that—he said in his opinion he might give him a conditional license.

Q. Did Dr. Thomas also allude to the fact that this, in quotes, hell of a mess might also lead to a lawsuit?

A. It already had.

Q. Were they discussing the lawsuit?

A. I don't remember.

Q. How did you know that it was already in a lawsuit?

A. He may have—just a minute, let me think. I don't recall at all why I wrote that.

Q. How did you know that Dr. McGee was already facing a lawsuit when you responded to one of my questions earlier?

A. I think that's something I derived from listening.

Q. From the hearing?

A. Yes.

Q. So on October 14th, 1988, you knew that if someone—

A. No, I did not.

Q. —had sexual indiscretions with their patients, it could lead to a lawsuit?

A. No, I did not.

Q. You just got through telling me that was something you derived.

A. I'm very anxious and it's hard for me to think, and I'm trying very hard to remember exactly why I wrote these things down, and they just don't have any significance, some of them don't.

Q. Why did you tell me just a few seconds ago, Ms. Roe, that you derived the fact from this hearing that Dr. McGee was facing a lawsuit for this conduct that you thought paralleled conduct that Dr. Jefferson had with you?

A. I had been told over the telephone that this person's husband had brought this lawsuit. I don't know why I wrote that down.

Q. You don't know why?

A. No, but it was never my intention to bring a lawsuit against Dr. Jefferson at this date.

Q. Had I asked that question?

A. No.

Roe never told Dr. Jefferson that she had attended the McGee hearing. She testified that her mental health, which had improved since 1984, began to rapidly deteriorate because of the mental abuse Dr. Jefferson was inflicting upon her. A diary that she kept during this period corroborates this testimony: in November 1988 she wrote in that diary that Dr. Jefferson had "hurt her deeply, psychologically" and that she had "no self-respect and no self-esteem" left because of the way she had been treated. In November 1988 the Board sanctioned Dr. Jefferson for his involvement with the patient in 1979. As part of this sanction, Dr. Jefferson was instructed to write four scholarly papers concerning the subject of sex in the therapist-patient relationship. Dr. Jefferson enlisted Roe's assistance in researching and writing these papers, but their relationship continued as before.

The sexual relationship between Roe and Dr. Jefferson ended on February 24, 1989; the last time they saw each other in person was March 16, 1989. Roe testified that during the period from December 1988 to March 1989 Dr. Jefferson continually called her and demanded to see her, even though she insisted that she would not see him. She testified that her mental state was very poor during this period, and that she was drinking heavily and frequently felt suicidal. Roe informed her husband of the affair in May 1989 and sought professional help from psychotherapists David McMillian and Jeanne Brownlee shortly thereafter.

Roe brought an action against Dr. Jefferson on February 23, 1990, for medical malpractice; the complaint essentially alleged that Dr. Jefferson had abused the doctor-patient relationship by engaging in a sexual relationship with Roe. After discovery was completed, Dr. Jefferson filed a motion for

summary judgment, arguing that Roe's action was barred by the one-year statute of limitations in medical malpractice cases because she either knew or reasonably should have known of the wrongful conduct and resulting injury before February 23, 1989. Roe filed a response to the motion for summary judgment, which included several affidavits from mental health professionals regarding the unique nature of the therapist-patient relationship. An affidavit given by Jeanne Brownlee, Roe's primary therapist, stated that because of a phenomenon called "transference" which occurs in a therapist-patient relationship, Roe could not have known that she was injured until the middle to latter months of 1989, when Brownlee informed her she had been abused. After taking the matter under advisement, the trial court granted Dr. Jefferson's motion for summary judgment on the basis of the statute of limitations.

The Court of Appeals reversed the judgment of the trial court. In so doing, the Court emphasized the unique nature of the therapist-patient relationship and the phenomenon of "transference" which occurs in that relationship. The Court, relying on the expert testimony submitted by Roe, stated that the term "transference" refers to the process whereby the patient transfers to the therapist all the unresolved issues of his or her life; in effect, the patient forms a relationship with the therapist akin to that of parent and child. Because the patient gives himself or herself completely over to the therapist, the patient inevitably becomes extremely vulnerable to the therapist. This vulnerability is a necessary aspect of any effective psychotherapy, because it is precisely this quality of trust that enables the patient to talk freely with the therapist and to get better. After its discussion of transference, the Court noted that Dr. Jefferson repeatedly told Roe that she was different from the other patients with whom he had had affairs, and that he loved her. The Court also noted that Dr. Jefferson often told Roe that sex with patients was not wrong in every instance. The Court held that these statements, when considered in light of the phenomenon of transference, created an issue of fact as to whether Roe knew or reasonably should have known that Dr. Jefferson's actions were wrongful more than one year before she brought the action. The Court concluded its discussion of this issue by stating:

> Here, it is clear that the statute of limitations could not have begun to run in October 1988 even if plaintiff somehow discerned from her one and one-half hour at the board hearing that what defendant was doing amounted to malpractice. Negligence without injury is not actionable. She neither knew nor reasonably could have known of her injury until she was diagnosed by Ms. Brownlee.

The Court alternatively held that an issue of fact existed as to whether the statutory period of limitations had been tolled because Roe was subjected to a "continuing tort." Because we believe that this is effectively the same issue in this case as whether the discovery rule served to toll the statutory period of limitations, we decline to discuss the question of whether the "continuing tort" theory applies in this case.

## STATUTE OF LIMITATIONS

The statutory period of limitations in medical malpractice cases is one year after the cause of action accrues. Tenn.Code Ann. § 29–26–116(a)(1). The point in time at which the cause of action accrues is governed by § 29–26–116(a)(2), which provides that "[i]n the event the alleged injury is not discovered within the said one (1) year period, the period of limitation shall be one (1) year from the date of such discovery." This Court has interpreted § 29–26–116(a)(2) to mean that the statute of limitations in a medical malpractice case is tolled until the plaintiff "discovered, or reasonably should have discovered, (1) the occasion, the manner, and the means by which a breach of duty occurred that produced his injuries; and (2) the identity of the defendant who breached the duty." *Foster v. Harris,* 633 S.W.2d 304 (Tenn.1982). Moreover, we have held that the discovery rule applies

> only in cases where the plaintiff does not discover and reasonably could not be expected to discover that he has a right of action.... the statute is tolled only during

the period when the plaintiff has no knowledge at all that a wrong has occurred, and, as a reasonable person is not put on inquiry.

*Hoffman v. Hospital Affiliates,* 652 S.W.2d 341, 344 (Tenn.1983). It is not required that the plaintiff actually know that the injury constitutes a breach of the appropriate legal standard in order to discover that he has a "right of action"; the plaintiff is deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct.

Dr. Jefferson argues that the Court of Appeals erred in applying the discovery rule because the evidence is undisputed that Roe knew in October 1988—the date of the McGee hearing—that sex in the therapist-patient relationship constituted a violation of the Board's regulations governing therapists, and could result in the loss of the therapist's license. Dr. Jefferson also argues that Roe's testimony reveals that she knew that such conduct could subject the therapist to an action for medical malpractice. Dr. Jefferson further argues that at the very least this knowledge should have placed Roe on inquiry that she had suffered injuries as a result of wrongful conduct.

Roe counters by asserting that the transference phenomenon precluded her from realizing what was happening to her. She asserts that she could not have known that she had been injured until she had been diagnosed by a mental health professional—Ms. Brownlee in this case. She argues that because the reviewing court on a summary judgment motion must consider the record in the light most favorable to the nonmovant, the issue of whether she reasonably should have known that she had been injured is a question of fact for the jury.

## OUR CONCLUSION

Initially, this Court has serious reservations about the Court of Appeals' reliance on the transference phenomenon in this case. This phenomenon, although generally accepted in the field of psychotherapy, is susceptible to many differing interpretations and has not yet been completely verified by quantitative, objective studies. *See* Handbook of Psychotherapy and Behavior Change: An Empirical Analysis (Sol Garfield and Allen Bergin, eds., 1978). We do note, however, that despite the incompleteness of knowledge regarding this phenomenon several jurisdictions have recognized its validity. *See e.g., Simmons v. United States,* 805 F.2d 1363 (9th Cir.1986); *L.L. v. Medical Protective Co.,* 122 Wis.2d 455, 362 N.W.2d 174 (App. 1984); *Zipkin v. Freeman,* 436 S.W.2d 753 (Mo.1968). However, we need not decide in this case the difficult issue of whether to recognize the transference phenomenon, because assuming without deciding that the phenomenon is valid, we are convinced after a review of the law of other jurisdictions that Roe had sufficient knowledge of the wrongful nature of Dr. Jefferson's acts to render her failure to file an action within one year of October 14, 1988, unreasonable as a matter of law. Two decisions—*Seymour v. Lofgreen,* 209 Kan. 72, 495 P.2d 969 (1972) and *Decker v. Fink,* 47 Md.App. 202, 422 A.2d 389 (1980)—will serve to illustrate the reasoning underlying this conclusion.

In *Seymour* the plaintiff brought an action against a physician for medical malpractice, alleging that he failed to diagnose her schizophrenia and that he mishandled the transference phenomenon by sexually assaulting her. The plaintiff brought the action on March 27, 1970; the doctor-patient relationship ended on April 25, 1967. The Kansas Supreme Court affirmed the trial court's dismissal of the action on statute of limitations grounds. The Court reasoned that because the plaintiff had changed doctors and was diagnosed as a schizophrenic by a psychiatrist in late April 1967, she knew the fact and cause of her injury at that time and was thus prohibited by the two-year statute of limitations from bringing suit in March 1970.

In *Decker* the plaintiff brought an action against her therapist on April 7, 1977, alleging that he had mishandled the transference phenomenon by engaging in a sexual affair with her. The plaintiff alleged that this activity had occurred from April 1965 to February 1971. The Maryland Court of Special Appeals affirmed the directed verdict in favor of the defendant on the ground that the

**658**

three-year statutory period of limitations had expired. The Court reasoned that because the plaintiff had seen other psychiatrists in 1973 who had told her that sex in a therapist-patient relationship was harmful to patients, the plaintiff reasonably should have known of her injury sometime during 1973 and therefore was required to file her action no later than the latter part of 1976.

The essence of the *Seymour* and *Decker* decisions is that if the plaintiff receives notice from a qualified mental health professional that sex in the context of a therapist-patient relationship is harmful, the plaintiff will be deemed to have discovered the right of action as a matter of law. Applying this reasoning to the present situation, we are convinced that Roe was possessed of sufficient information to put her on notice as a matter of law. First, it is undisputed that Roe knew in early 1988 that Dr. Jefferson was under investigation by the board for ethical violations in connection with his sexual relationship with a prior patient. Roe knew, moreover, that Dr. Jefferson could potentially lose his license for this conduct. It is also undisputed that Roe heard, at the McGee hearing on October 14, 1988, substantial testimony from mental health professionals that sex in a therapist-patient relationship was wrong and was prohibited by the regulations of the Board. Although it is unclear whether Roe actually realized that Dr. Jefferson's conduct could subject him to legal liability in addition to professional sanctions, this fact is immaterial because the statute of limitations is not tolled until the plaintiff becomes aware of the defendant's legal fault under Tennessee law. It is also clear that Roe's injuries had manifested themselves about the time of the McGee hearing, because her diary entries in early November indicate that she had deeply been hurt by Dr. Jefferson and had lost all self-esteem because of him. Although Roe was not directly informed by a mental health professional in the context of a doctor-patient relationship that she had suffered psychological injuries, her exposure to the testimony at the McGee hearing, considered in light of the other facts of the case, leads us to conclude that no reasonable trier of fact could find that Roe was unaware that she had suffered an injury

for purposes of the discovery rule. Therefore, the judgment of the Court of Appeals is reversed, and the judgment of the trial court is affirmed.

REID, C.J., and O'BRIEN, ANDERSON and BIRCH, JJ., concur.