JOHN KOHL & COMPANY, P.C.,            )
JOHN B. KOHL, III, and HELEN H. KOHL, )
Individually, and JOHN B. KOHL, III,  )
TRUSTEE, as Trustee of the John Kohl & )
Company, P.C. Profit Sharing Plan,    )
                                      )
        Plaintiffs/Appellants,        )        Appeal No.
                                      )        01-A-01-9609-CV-00421
v.                                    )
                                      )        Davidson Circuit
DEARBORN & EWING, a Tennessee         )        No.    90C-1962
General Partnership, and              )
DAN E. HUFFSTUTTER,                   )
                                      )
        Defendants/Appellees.         )

FILED

April 23, 1997

Cecil W. Crowson
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE

MIDDLE SECTION AT NASHVILLE

APPEAL FROM THE CIRCUIT COURT FOR DAVIDSON COUNTY

AT NASHVILLE, TENNESSEE

THE HONORABLE THOMAS W. BROTHERS, JUDGE

STEVEN C. DOUSE
King & Ballow
1200 Noel Place
200 Fourth Avenue, North
Nashville, Tennessee  37219
        ATTORNEY FOR PLAINTIFFS/APPELLANTS

JOHN BRANHAM
KATHRYN BARNETT
Branham & Day
150 Fourth Avenue North
Suite 1910
Nashville, Tennessee  37219
        ATTORNEYS FOR DEFENDANTS/APPELLEES

AFFIRMED IN PART,
REVERSED IN PART,
AND REMANDED

SAMUEL L. LEWIS, JUDGE

# OPINION

This is an appeal by plaintiffs/appellants, John and Helen Kohl, from a decision of the Davidson County Circuit Court. The trial court awarded Plaintiffs a total of $33,091.05 for the legal malpractice of defendants/appellees, Dearborn & Ewing and Dan E. Huffstutter, and held the remainder of Plaintiffs' claims were barred by the statute of limitations. The facts out of which this matter arose are as follows.

Plaintiffs own a land surveying business. They retained Defendants in 1983 to incorporate the business and to handle other corporate matters. From 1983 to 1988, Huffstutter advised Plaintiffs on many issues. He aided them in the development of a profit sharing plan ("the Plan") and administered the Plan until 1988. He also advised Plaintiffs in 1986 on how to finance the purchase of a building for their business. Pursuant to this advice, Plaintiffs obtained a loan from Commerce Union Bank. The Small Business Administration covered a portion of the loan. Huffstutter advised Plaintiffs the Plan should purchase all or a portion of the loan. He explained to Plaintiffs they needed to transfer funds from their IRA accounts into the Plan in order to do this, but stated the IRA withdrawals would not be taxed.

In September 1988, Plaintiffs received a letter from the IRS informing them of the following:

> In our review of your tax return for 1986, it appears that the income deductions, and credits you reported do not agree with the amounts reported to us on information returns filed by the payers. (see attached page(s)).
> Please explain in a signed statement where the amounts are reported on your tax return. If the income was not reported or if the deductions or credits were overstated, please explain why.

Plaintiffs responded to the letter through their accountant, David Hinton. In October 1988, Robert E. Kolarich, Plaintiffs' attorney, wrote Dearborn & Ewing the following letter:

> In our last discussion of John Kohl's account with your firm, it was agreed that you would handle the application for an extension of his tax return, after which the file would be removed. Mr. Kohl intends to hire a new firm to handle his tax work, however, I understand that a new question has arisen with regard to his pension and profit sharing plans. Evidently, Mr. Huffstetter [sic]

had advised that the funds held in an IRA account could be transferred to the pension and profit sharing account and the IRS is reviewing the transaction. Please advise as to when this issue may be resolved so that the files may be transferred.

John Kohl next received a letter in August 1989 from Dearborn & Ewing. The letter stated, in part, as follows: "However, because the Sales Agreement also looked to the status of Plan participants (as beneficial owners of the Plan), officers and shareholders of the Borrower who are also Plan participants may cause the Plan's purchase of the SBA Loan to be questioned."

Plaintiffs filed a complaint against Huffstutter and Dearborn & Ewing on 1 May 1990. The complaint alleged the following acts constituted legal malpractice: 1) advising Plaintiffs the Plan should acquire all or a portion of the $250,000.00 loan; 2) advising Plaintiffs they should transfer funds from their IRA accounts into the Plan and the withdrawals would not be taxed; and 3) advising Plaintiffs to make a $2,000.00 voluntary deductible contribution to the Plan in 1986. Defendants answered the allegations and claimed Plaintiffs had failed to mitigate their damages and the statute of limitations barred their claims. Plaintiffs moved to amend their complaint by adding a count regarding the negligent drafting and administration of the Plan. The court granted the motion.

Defendants filed a motion for partial summary judgment as to Plaintiffs' claims to attorney's fees incurred in pursuit of the litigation on 22 January 1996. Defendants argued there was no statutory, legal, or contractual basis for the recovery of the fees. The court granted the motion, but noted that it made no determination as to the remainder of Plaintiffs' claims "including attorney's fees allegedly expended for corrective action resulting from defendants' negligence."

Trial was held from 29 April to 2 May 1996. Plaintiffs submitted a supplement to their expert witness statement on 26 April 1996. The supplement reflected an upward change in the amount of damages for the lost value of the funds transferred from the IRA accounts. During the trial, Plaintiffs moved the court to amend their complaint to claim special damages for the fees paid to Dearborn & Ewing for the negligent work. The court denied the motion. The trial court also ruled that it would only consider the expert testimony consistent with the original expert

witness statements and depositions. As a result, the trial court completely disregarded the supplemental expert witness statements of Samuel Butts, Plaintiffs' expert. Finally, the trial court ruled the testimony of Larry Crabtree, the attorney who performed or supervised the corrective work, was not admissible under Disciplinary Rule 5-101(B)(3).

The trial court entered its final order on 22 May 1996. The order incorporated the trial court's findings of fact and conclusions of law made at the close of the parties' cases. As to the statute of limitations defense, the trial court reasoned as follows:

> In this case, Mr. Kolarich wrote a letter on October 24, 1988 that clearly points out there is some problem associated with the rollover of IRA funds into the pension plan, it had been noticed, they were aware of it, and it was so severe in his mind and Kohl's mind that they were going to change law firms and have someone else do their tax work. They had turned this over to their CPA. They were taking actions. They knew that they had received some injury as a result of potentially erroneous advice they had received from Mr. Huffstutter and the Dearborn & Ewing law firm.
>
> And the Court finds that as of October 24, 1988, the Kohls should have known, if they were not aware, they should have known, as a reasonable person, that they had suffered a legally cognizable injury from the misconduct of Mr. Huffstutter. And therefore, any action against him should have been filed in relationship to that rollover within one year. An interesting question is whether -- and therefore, the claims based upon the rollovers are barred.
>
> A question that's tied in with that is whether or not that bars any recovery. Does that put them on notice as to the entire plan? And I find that it does not, This letter is very specific. It points out that there are problems with the changing of monies from an IRA plan into a pension plan, profit sharing plan only. It doesn't address the SBA loan or any other aspect of the plan, simply that specific item. And I think that it is clearly distinct enough that it does not bar their filing suit until they became aware of this, under Mr. Kohl's testimony, sometime shortly before he first went to King & Ballow in September of 1989, and this action was filed timely -- in a timely manner for the other claims.

The court held Defendants liable to Plaintiffs in the amount of $28,591.05 for advising Plaintiffs the Plan could purchase a portion of the loan and in the amount of $4,500.00 for negligently drafting and administering the Plan. The trial court also

ruled that it would have awarded $30,000.00 to Plaintiffs for the lost earning power of the money withdrawn from the IRA accounts and $19,000.00 in attorney's fees had the statute of limitations not barred the claims relating to the IRA rollovers. Thereafter, Plaintiffs filed a timely notice of appeal and presented the following issues:

I.      Whether the trial court erred in holding that the statute of limitations barred recovery for certain damages claimed by Plaintiffs.

II.     Whether the trial court erred in holding that Plaintiffs were not entitled to recover, as general damages in a legal malpractice action, fees paid for legal work that was negligently performed.

III.    Whether the trial court erred in granting a partial summary judgment holding that Plaintiffs could not as a matter of law recover any of the costs of prosecuting this action as consequential damages for legal malpractice.

IV.     Whether erroneous evidentiary rulings by the trial court prejudiced the record on which the court assessed damages.

We address all of these issues below.

## I.      Statute of Limitations

Recently, the Tennessee Supreme Court addressed the issue of when the statute of limitations begins to run in legal malpractice actions. *Carvell v. Bottoms*, 900 S.W.2d 23, 28-30 (Tenn. 1995). The court restated the two occurrences necessary to begin the running of the statute of limitations and modified them to avoid past confusion.

The first occurrence necessary to begin the running of the statute is the plaintiff must suffer a legally cognizable or actual injury as a result of the defendant's negligence. *Id.* Prior to the decision in *Carvell*, judges, practitioners, and scholars used the term "irremediable injury" instead of legally cognizable or actual injury. *See id.* at 28. In *Carvell*, the supreme court changed the terminology.[1] The second

---

[1] In a footnote to their brief, Plaintiffs argue that this court should not apply *Carvell* retroactively to their case if *Carvell* overruled prior precedent. It is the opinion of this court that the supreme court did not overrule its earlier decisions. Although the court directed that courts should no longer use the term "irremediable injury," it did not expressly overrule or criticize any of its earlier decisions. Moreover, the court did not attempt to provide definitions of the new

occurrence necessary to begin the running of the statute of limitations is that "the plaintiff must have known or in the exercise of reasonable diligence should have known that this injury was caused by the defendant's negligence." *Id.* The court then elaborated on the knowledge requirement and adopted a holding from a medical malpractice case. The court stated:

> It is not required that the plaintiff actually know that the injury constitutes a breach of the appropriate legal standard in order to discover that he has a 'right of action'; the plaintiff is deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct.

*Id.* at 29 (quoting ***Roe v. Jefferson***, 875 S.W.2d 653, 657 (Tenn. 1994)).

Applying these requirements to this case, it is the opinion of this court that the statute of limitations had run on those claims related to the IRA rollovers. In this case, the legally cognizable or actual injury occurred at the very latest when Plaintiffs began to incur expenses as a result of Defendants' negligent advice. The earliest evidence of this in the record is 19 October 1988. On this date, Plaintiffs' accountant, David Hinton, wrote a letter to the IRS in response to the IRS's request for information. The IRS letter, quoted in an earlier portion of this opinion, explained that the IRS had noticed a conflict between the amounts reported by Plaintiffs and those amounts reported by payers. Mr. Hinton's response stated: "Please be advised that the retirement plan distributions were rolled over to the John Kohl Company, P.C., Profit-Sharing Plan." As of the date of this letter or possibly even earlier, Plaintiffs began incurring expenses directly related to Mr. Huffstutter's advice on the IRA rollovers. [2] Thus, Plaintiffs were actually injured at that time.

Plaintiffs correctly stated that the injury element is not met if it is contingent on a third party's actions or if there is a mere possibility or probability of injury.

---

terms. Thus, it seems the supreme court simply changed the terms to avoid the confusion caused by the word "irremediable." It appears the court's previous decisions which used the term "irremediable injury" may still be useful in deciding when a legally cognizable or actual injury has occurred.

[2] We could not find any direct evidence that Mr. Hinton charged Plaintiffs for his services. Nevertheless, there is sufficient evidence in the record from which we can infer Plaintiffs compensated Mr. Hinton for his services.

*Caledonia Leasing and Equip. Co. v. Armstrong, Allen, Braden, Goodman, McBride & Prewitt*, 865 S.W.2d 10, 17 (Tenn. App. 1992). Relying on this case, Plaintiffs argue that the injury was still inchoate in October 1988 because the IRS had not filed suit or issued a deficiency statement and Plaintiffs had not incurred any attorney's fees or other damages. We can not agree. Plaintiffs' injuries were no longer contingent on a third party's actions or speculative once they began to incur expenses related to the negligence.[3] In addition, it is not necessary for Plaintiffs to have suffered all the injurious effects of Defendants' negligence for the statute to begin running. *Security Bank & Trust Co. v. Fabricating, Inc.*, 673 S.W.2d 860, 864-65 (Tenn. 1983).

It is the opinion of this court that Plaintiffs had the requisite knowledge at the very latest on 24 October 1988. On that date, John Kolarich, Plaintiffs' attorney, wrote a letter. The letter clearly demonstrates Mr. Kolarich knew the IRS's investigation involved the rollover of funds into the Plan and Mr. Huffstutter had advised Plaintiffs' as to the rollovers. Mr. Kolarich's knowledge is attributable to Plaintiffs. *Moody v. Moody*, 681 S.W.2d 545, 546 (Tenn. 1984). It is not necessary for a plaintiff to know the facts constitute a claim for legal malpractice. Instead, a plaintiff only needs to be "aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct." *Carvell*, 900 S.W.2d at 29 (quoting *Roe v. Jefferson*, 875 S.W.2d 653, 657 (Tenn. 1994)). It is the opinion of this court that the knowledge that the IRS was investigating a transaction recommended by an attorney without reservation is sufficient to put a reasonable person on notice.

The statute of limitations as to any claims resulting from the IRA rollovers began to run on 24 October 1988. As of that date, Plaintiffs had suffered an actual injury and had the requisite knowledge. Plaintiffs filed their complaint on 1 May 1990. The trial court correctly determined the statute of limitations barred Plaintiffs' claims because they filed their complaint more than one year after the cause of action accrued. Tenn. Code Ann. § 28-3-104(a)(2) (Supp. 1996).

---

[3] We note that our decision in this case does not mean that a plaintiff has to incur monetary damages in order for there to be actually injury. It just happens to be so in this case.

## II. Damages

Plaintiffs' second and third issues involve the different types of damages available in a legal malpractice action. This case involves three different categories of attorney's fees. The first, initial fees, are those fees the plaintiff paid or agreed to pay to the negligent defendant. The second, corrective fees, are those fees the plaintiff incurred to correct the errors created by defendant's negligence. The existence of corrective fees distinguishes this case from a great majority of the cases. To explain, every case does not include corrective fees. For example, when an attorney fails to file a personal injury claim within the statute of limitations there are no corrective fees. The injured party has incurred only the initial fees and has lost his or her claim. Finally, the third category of fees, litigation fees, are those fees paid by the plaintiff to prosecute the malpractice action. It is Plaintiffs' contention that they should be able to recover both their initial fees and their litigation fees and at the very least one of the two.

### A. Initial Fees

Plaintiffs primarily rely on *Foster v. Duggin*, 695 S.W.2d 526 (Tenn. 1985), to support their argument that they are entitled to the initial fees and the litigation fees. Although the specific facts of *Foster* are distinguishable from the present case, the general holding of the case is useful. In *Foster*, the plaintiffs retained an attorney, Mr. Duggin, on a contingency fee basis to represent them in a personal injury action. Mr. Duggin committed malpractice when he failed to file the complaint within the statute of limitations. As a result, the plaintiffs lost their claim. This is the typical malpractice scenario. In such a case, the successful plaintiff is entitled to recover at the very least the value of the lost claim. 7 Am Jur. 2d *Attorneys at Law* § 226 (1980).

The only issue before the *Foster* court was whether the trial court should have reduced the malpractice award by the fee Mr. Duggin would have received had he competently handled the case. *Foster*, 695 S.W.2d at 526. The trial court concluded that Mr. Duggin was not entitled to a set off and the court of appeals affirmed. The supreme court also agreed Mr. Duggin was not entitled to a set off and

explained "the burden of [Mr. Duggin's] incompetence should not be placed upon the innocent client" and the plaintiffs "should not be required to assume the burden of twice paying for legal representation." *Id.* at 527. Thus, the plaintiffs recovered their initial fees in a roundabout way. *See also Bruce v. Olive*, No. 03A01-9509-CV-00310, 1996 WL 93580, at *5 (Tenn. App. 4 March 1996).

Although *Foster* was a contingency fee case, there is no reason why the same logic can not be applied in this case. The Plaintiffs in the present case are entitled to recover their initial fees with the exception that Defendants receive "credit for expenses which were incurred on behalf of [Plaintiffs] which ultimately benefitted [Plaintiffs]." *Foster*, 695 S.W.2d at 527. Defendants argue that allowing Plaintiffs to recover their initial fees ultimately allows them to receive free legal services because they will recover both the corrective fees and the initial fees. At first glance this argument appears logical, but this conclusion is not necessarily the result dictated by the case law. First, the corrective fees in this case are analogous to the value of the lost claim in *Foster*, that is, the damages directly flowing from the malpractice. Second, the justification of the supreme court in *Foster* that a plaintiff "should not be required to assume the burden of twice paying for legal representation" refers to the payment of the initial fees and the litigation fees. As is explained below, it is the opinion of this court that Plaintiffs are not entitled to their litigation fees. Thus, in the end Plaintiffs are having to pay certain fees for the work they had hoped to have properly performed in 1983.

## B. Litigation Fees

Plaintiffs argue that *Foster* stands for the proposition that litigation expenses are recoverable as incidental damages. Plaintiffs cite the following sentence: "The additional fees necessary to pursue this action are in the nature of incidental damages flowing from Mr. Duggin's breach of contract." We can not agree with Plaintiffs' argument. Although the statement seems clear, a literal application of the statement is inconsistent with the rest of the opinion. To explain, the statement is inconsistent because if plaintiffs were able to recover their litigation expenses the recovery of the initial fees would not be necessary to ensure that plaintiffs were not "required to assume the burden of twice paying for legal representation." *Id.*

Moreover, in another portion of the opinion, the supreme court discussed the majority view and explained that the litigation fees "are said to cancel out any fees which the plaintiff would have owed the attorney had he performed competently." *Id.* It is clear that the supreme court intended to award the initial fees only. This is further evidenced by the fact that the court limited its decision to a determination of this issue only. *Id.* at 526. Thus, it is the opinion of this court that *Foster* does not stand for the proposition that a plaintiff in a legal malpractice action may recover their litigation fees.

It is further the opinion of this court that Plaintiffs are not entitled to their litigation fees. A party may not recover attorney's fees absent a contractual agreement between the parties or a statutory provision. *Goings v. Aetna Cas. &Sur. Co.*, 491 S.W.2d 847, 848 (Tenn. App. 1972). Attorney's fees are no more damages in a legal malpractice action than they are in a personal injury case. Plaintiffs have failed to convince this court that Tennessee's courts should treat legal malpractice claims differently than all other claims.

### C. Initial Fees as Special or General Damages

In addition to determining that the law did not entitle Plaintiffs to recover the initial fees, the trial court also determined the initial fees were special damages and denied Plaintiffs' request to amend their complaint to include a claim for the initial fees as special damages. We disagree and hold that the initial fees are recoverable as general damages.

The supreme court has defined general and special damages as follows: "'General damages are such as *naturally and necessarily* result from the wrong of injury complained of, while special damages are such as *naturally but not necessarily* result from the wrong or injury complained of.'" *Inland Container Corp. v. March*, 529 S.W.2d 43, 44 (Tenn. 1975) (quoting Caruthers, History of a Lawsuit §155 (8th ed. 1963)). Initial fees as damages naturally result from legal malpractice. In all malpractice cases, the plaintiff has retained an attorney presumably for a fee to perform certain services. If malpractice occurs, the plaintiff may recover the fee which is a natural part of the transaction. Moreover, the recovery of a fee paid to a

negligent attorney is necessary to make the plaintiff whole. Thus, the trial court erred when it determined the initial fees were special damages.

## III. Expert Testimony

### A. Samuel Butts

Following our review of this record we are of the opinion that the trial court did not err in excluding portions of the testimony of Samuel Butts, Plaintiffs' expert witness. The trial court excluded portions of Mr. Butts' testimony for two reasons: 1) Plaintiffs failed to seasonably supplement his expert witness testimony and 2) the basis of his testimony lacked trustworthiness.

The trial court has discretion to determine the proper corrective action for discovery abuses. This court will not disturb that determination unless the trial court abused its discretion. *Lyle v. Exxon Corp.*, 746 S.W.2d 694, 699 (Tenn. 1988). In the instant case, Mr. Butts was deposed on 22 September 1995. Eight months later on the Friday before the trial on Monday, Plaintiffs delivered a supplement to Mr. Butts's prior testimony. The supplement substantially altered his prior opinions. During his deposition, Mr. Butts concurred with a damage memorandum of December 1992 that estimated Plaintiffs' damages resulting from the "loss of use" of funds to be $58,000.00. His supplement raised that amount significantly. On the morning of trial, Plaintiffs produced another calculation raising the damage claim to $124,668.75. Mr. Butts was also of the opinion in his deposition that $27,000.00 in attorney's fees were reasonable. His later statement raised that amount to $50,335.91.

There are certain factors for trial courts to consider when determining appropriate sanctions for abuse of expert witness discovery. These are: 1) the explanation given for the abuse; 2) the importance of the testimony; 3) the need for time to prepare; and 4) the possibility of a continuance. *See id.* The trial court entertained arguments from the parties on the application of these factors to the admission of Mr. Butts's testimony. In regard to the need for time to prepare to address this substantial leap in the expert's opinion of damages, the trial court

commented: "I am concerned. It's about a $68,000 jump and it would surprise me, and it sounds like that's a surprise to someone if they were not made aware of that till three days before trial." Considering the first factor in *Lyle*, the trial court found as follows:

> The Court finds that there is no justification for this unseasonable response to a timely discovery response.
> The purpose of Rule 26 and the purposes of scheduling orders are to require that expert witnesses set forth their opinions with certain sufficient clarity that the opponents may have the opportunity to prepare to respond to those opinions.

It is clear from the record in the instant case that the trial court properly and fairly considered the Plaintiffs' proof and arguments regarding the failure to comply with the discovery rules. Moreover, the trial court did not exclude all of Mr. Butts' testimony, but held an appropriate sanction was the exclusion of those portions of Mr. Butts's testimony that exceeded his earlier discovery responses. We are of the opinion this was not an abuse of the trial court's discretion.

The trial court had other reasons for limiting Mr. Butts's testimony. The trial court found the increased damages amount was contrary to Mr. Butts's original deposition testimony and seemed untrustworthy. The court noted: "I have some concerns over the trustworthiness of Mr. Butts' [sic] testimony, specifically dealing with these calculations that were not even prepared by him that presume individuals living to be 115 years old to the year 2056. Frankly some of those figures seemed absurd." Tennessee Rule of Evidence 703 provides: "The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness."

Determinations concerning the admission of expert testimony are left to the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Buchanan v. Harris*, 902 S.W.2d 941, 945 (Tenn. App. 1995). In the instant case, the trial court was afforded the opportunity to observe and consider the testimony offered by Mr. Butts over the course of two days. Plaintiffs offered no indication that the court's finding of the lack of trustworthiness was an arbitrary exercise of discretion. The court did not abuse its discretion in striking portions of Mr. Butts's testimony. Therefore, we are of the opinion this issue is without merit.

**B. Larry Crabtree**

The trial court also excluded the testimony of Plaintiffs' co-counsel, Larry Crabtree. Plaintiffs proposed to offer Mr. Crabtree's testimony to explain and justify the fees charged by King & Ballow to correct defendants' errors.

Cannon 5 of the Code of Professional Conduct provides that "a lawyer should exercise independent professional judgment on behalf of a client." Disciplinary Rule 5-101(B) mandates:

> (B) A lawyer shall not accept employment in contemplated or pending litigation if the lawyer knows or it is obvious that the lawyer or a lawyer in the lawyer's firm ought to be called as a witness, except that the lawyer may undertake the employment and the lawyer or a lawyer in the lawyer's firm may testify:
> (1) If the testimony will relate solely to an uncontested matter.
> (2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
> (3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or the lawyer's firm to the client.
> (4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or the lawyer's firm as counsel in the particular case.

This rule embodies important public policy considerations and ultimately protects clients. Ethical Consideration 5-9 recognizes the costs to a client when an attorney/ witness refuses to withdraw as counsel providing: "If a lawyer is both counsel and witness, the lawyer becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer . . . . An advocate who becomes a witness is in the unseemly and ineffective position of arguing the advocate's own credibility." Finally, Ethical Consideration 5-10 mandates: "Where the question arises, doubt should be resolved in favor of the lawyer testifying and against becoming or continuing as an advocate." These guidelines are clear. An attorney must steadfastly guard against becoming both an advocate and a witness.

This court has held that trial courts "have a broad range of options available to insulate trials from ethical taint." ***Hilton v. Crawford***, No. 03A01-9102CV33,

1991 WL 261872, at *3 (Tenn. App. 13 Dec. 1991). In **Hilton**, the court concluded: "[T]he mere fact that counsel is a potential witness is not sufficient reason for disqualification. It may very well be, however, if counsel wish to become a witness the Trial Court might exclude their testimony. . . ." **Id.**

Plaintiffs argue the exception contained in Disciplinary Rule 5-101(B)(3) applies to Mr. Crabtree's testimony. We disagree. The issues which Mr. Crabtree's testimony would address are more involved than merely stating the "nature and value of legal services rendered." In this case, Mr. Crabtree's testimony would necessarily address highly disputed issues.[4] In other words, the testimony and cross-examination would involve the appropriateness of the corrective actions taken, the results of the corrective actions taken, alternative actions which Plaintiffs could have taken, the cost of the corrective actions, estimates of the cost of alternative actions, the propriety of the fees actually incurred, and so on. As explained by the trial court, this is not a case where the testifying attorney simply lays the foundation for the trial court to make an award of attorney's fees.

Plaintiffs also argue the trial court should have permitted Mr. Crabtree to testify because excluding his testimony worked a hardship on Plaintiffs. The Sixth Circuit has noted that "[a] self-inflicted injury is not a hardship." **General Mill Supply Co. v. SCA Servs., Inc.,** 697 F.2d 704, 713 (6th Cir. 1982). The court in **General Mill** stated:

> Now they turn to the United States District Court and say in effect: 'Yes, judge, we know that the canons would never allow [the attorney] to represent General Mill in an abuse of process suit, and also be its star witness. But you can't do anything to us, because, knowing what was down the road, by our own deliberate action we created a situation where [the attorney] is indispensable to General Mill and his withdrawal a hardship. So, judge, you'll just have to swallow it.
>   . . . [T]he duty to withdraw is plainest when the need to be a witness is well known in advance. The canon would be absurd and indefensible if it excused compliance when the dependence of the client on the lawyer had been created in fact of the knowledge that the dependence would be used to frustrate the

---

[4] One reason for this conclusion is that the corrective work never rectified the problems with the plan. As a result, Plaintiffs terminated the Plan on 19 April 1996. In addition, Defendants contend, in part, that King & Ballow spent a great deal of time on project which they never completed.

> enforcement of the canon. The term "hardship" is certainly capable of rational interpretation, of meaning a situation the alleged victim of the hardship has not knowingly caused and could not reasonable foresee.

*Id.* at 714-15. After hearing the proffered Crabtree testimony, the trial court found: "This is exactly the type of situation that the DR 5-101 is intended to address. It puts lawyers in the most uncomfortable position to be both advocate and witness. This is not a situation that was not unforeseeable." Attorneys cannot be allowed to create client hardships in order to force the court to accept prohibited testimony.

In addition, the trial court in this case specifically found Plaintiffs suffered no substantial harm in the exclusion of Mr. Crabtree's testimony. We agree. Plaintiffs had an independent expert, Samuel Butts, who could base his opinions about the necessity and reasonableness of the corrective work upon Crabtree's representations to him. Based upon the record, the trial court did not abuse its discretion in excluding the testimony of co-counsel Larry Crabtree from the trial in this cause.

### IV. Conclusion

It results that the judgment of the trial court is affirmed in part, reversed in part, and remanded. On remand, the trial court shall determine the appropriate amount of the initial fees payable to Plaintiffs as damages. Costs on appeal are taxed equally to Plaintiffs and Defendants.

_____
SAMUEL L. LEWIS, JUDGE

CONCUR:

_____
BEN H. CANTRELL, J.

_____
WILLIAM C. KOCH, JR., J.