IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 16, 2023 Session

**FIRST COMMUNITY BANK, N.A. v.**
**FIRST TENNESSEE BANK, N.A., ET AL.**

**Appeal from the Circuit Court for Knox County**
**No. 3-475-11          E. Jerome Melson, Judge**

_____

**No. E2022-00954-COA-R3-CV**

_____

This is the third iteration of this action in this court concerning Plaintiff's claims against Defendant for fraud, constructive fraud, negligent misrepresentation, civil conspiracy, unjust enrichment, and violation of the Tennessee Securities Act, codified at Tennessee Code Annotated section 48-1-101, et seq. The claims arose out of the purchase of asset-backed securities that were later deemed unmarketable, causing a significant financial loss to Plaintiff. This particular appeal concerns the trial court's granting of summary judgment in favor of Defendant based upon the applicable statute of limitations. We now affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J. and THOMAS R. FRIERSON, II., J., joined.

Janet Strevel Hayes and Lawrence Francis Giordano, Knoxville, Tennessee; and Blair Preiser and Daniel P. Lynch, Cranberry Township, Pennsylvania, for the appellant, First Community Bank f/k/a First Community Bank, N.A.

Lori H. Patterson, Memphis, Tennessee; Thomas Lang Wiseman, Nashville, Tennessee; and Nicholas W. Diegel, Knoxville, Tennessee, for the appellee, First Tennessee Bank, N.A. d/b/a FTN Financial Capital Markets.

**OPINION**

**I. BACKGROUND**

This case involves the purchase by First Community Bank ("Plaintiff" or "FCB")

of approximately $135 million in asset-backed securities in the form of 11 notes issued by several collateralized debt obligations ("CDOs") and a collateralized mortgage obligation ("CMO"). Some of these purchases were made from First Tennessee Bank N.A., d/b/a FTN Financial Capital Markets, and its wholly owned subsidiary FTN Financial Securities Corp. (collectively "Defendant" or "FTN"). The purchases were made between 2003 and 2007. In layman's terms, CDOs or CMOs were investment vehicles through which an investment bank pooled together a group of notes, bonds or other debt obligations that it bought from banks, insurance companies, and real estate investment trusts. This pool of underlying securities was turned into a single security that was divided into different classes, or "tranches," based upon risk of default. The value of the notes was derived from income-producing assets such as bonds, mortgages, or other debt instruments. Each sale of the securities was conditioned upon the receipt of a minimum rating by one of the three major credit rating agencies known at that time.

The CDO market began experiencing unprecedented turmoil in 2006 and 2007, a harbinger of the global financial crisis that would occur in 2008. Deepening problems in the mortgage market in 2006 led to a "series of mass downgrades" of investments by the rating agencies. Plaintiff contends that the "sudden shock" of these downgrades contributed to the collapse of the secondary market for CDOs. The value of FCB's investments began decreasing in September 2007, only two months after FCB made its last purchase from FTN. On September 26, 2007, a United States Senate Committee hearing began in which the impact of the credit rating agencies on the subprime credit markets was discussed and testimony was presented alleging that the major rating agencies conspired with the loan originators to artificially inflate the market value of underlying loans.

By May 2008, Plaintiff realized a $28 million market decline in its trust preferred securities. On July 8, 2008, the Securities and Exchange Commission ("the SEC") issued a report, following a 10-month investigation into the rating agencies' policies and practices in rating mortgage-backed securities and the impartiality of such ratings. This report highlighted the problems inherent in the issuer pays model of rating securities utilized by Defendant and relied upon by Plaintiff. By the end of July 2008, the value of Plaintiff's investments had declined by over $40 million. By August 2008, Plaintiff's notes had either been downgraded by the rating agencies or were on negative credit watch.

Plaintiff experienced further defaults, deferrals, and downgrades to its investments in the fourth quarter of 2008 and into 2009, causing additional downgrades and further declines in market value to its portfolio. Around the same time that these defaults, deferrals, and downgrades were occurring, the collapse of the financial markets was the subject of intense interest by federal regulators, members of Congress, the press, and the public. Plaintiff eventually sold the securities between 2009-2011, incurring market losses of approximately $100 million.

Plaintiff filed its complaint on September 15, 2011, suing over 30 defendants involved in issuing, rating, and selling the securities, including Defendant and the rating agencies. Plaintiff amended its complaint, which included claims against Defendant for fraud, negligent misrepresentation, violation of the Tennessee Securities Act of 1980 ("TSA"), unjust enrichment, civil conspiracy, and constructive fraud. Plaintiff alleged that Defendant conspired with the ratings agencies, who were allegedly paid a fee to artificially inflate the ratings of investments to defraud investors. Plaintiff alleged that Defendant made misrepresentations about the risk associated with the securities, the thoroughness of the underwriting and rating processes, the adequacy of credit support and enhancement, whether the rating agencies had sufficiently reliable facts and sufficiently reliable models on which to assign their ratings, who was paying for ratings, "oversubscription" among institutional investors, and the soundness of the investments generally.

Several defendants filed motions to dismiss, which the trial court granted. On appeal, a panel of this court affirmed the dismissal against certain non-resident defendants, including the ratings agencies, for lack of personal jurisdiction, but reversed the dismissal for failure to state a claim as to the remaining defendants, including Defendant. *First Community Bank, N.A. v. First Tennessee Bank, N.A., et al.*, No. E2012-01422-COA-R3-CV, 2013 WL 4472514, at *1, 18–19 (Tenn. Ct. App. Aug. 20, 2013) ("*First Community Bank I*"). In reversing, this court held that the trial court had considered matters outside of the pleadings pertaining to the running of the statute of limitations, thus converting the motion to dismiss into one for summary judgment, requiring remand of the case for further discovery. *Id.* at *17–18.

The Tennessee Supreme Court granted permission to appeal to the defendants whose dismissal was reversed. The Tennessee Supreme Court, by Order, remanded the case to this court for "consideration of the trial court's alternative basis of dismissal of the complaint, i.e., the failure to state a cause of action or state a claim for which relief can be granted (other than on the basis of the running of the applicable statutes of limitations or repose)." On remand, a panel of this court reversed the trial court's ruling that Plaintiff failed to state a claim against FTN (and other defendants). *First Community Bank, N.A. v. First Tennessee Bank, N.A.*, No. E2012-01422-COA-R3-CV, 2014 WL 4102365, at *19 (Tenn. Ct. App. Aug. 20, 2014) ("*First Community Bank II*").[1]

---

[1] In a separate opinion, the Supreme Court affirmed the trial court and this court's holding that Plaintiff failed to establish a prima facie case of personal jurisdiction over the non-resident defendants under the theories of general and specific jurisdiction. *First Community Bank, N.A. v. First Tennessee Bank, N.A.*, 489 S.W.3d 369, 381 (Tenn. 2015). However, the Supreme Court vacated the dismissal as to Plaintiff's claim of conspiracy jurisdiction and remanded for a determination of whether Plaintiff should be allowed to conduct jurisdictional discovery on the issue of conspiracy jurisdiction. *Id.* at 407–08. Upon remand, a panel of this court issued an order holding that plaintiffs were entitled to conduct limited discovery on the issue of conspiracy jurisdiction. This appeal and resulting order did not directly involve Defendant.

Back in the trial court, the parties engaged in pre-trial motion practice and discovery. Plaintiff dismissed numerous defendants from the action, leaving only Defendant. After engaging in discovery, Defendant moved for summary judgment on June 16, 2021.

Following a hearing, the trial court granted summary judgment to Defendant, finding that Plaintiff was on inquiry notice of its claims prior to September 15, 2008, barring recovery on its common law claims pursuant to the applicable statute of limitations. In reaching this conclusion, the trial court found that FCB had a heightened regulatory duty to conduct due diligence and examine its complex, asset-backed securities. Further, the trial court found that "FCB was placed on inquiry notice of its claims due to the sharp decline in value of the securities, the negative rating actions taken on the securities, the increase in defaults, and the highly publicized Congressional hearings, the 2008 SEC Report, and news articles and industry reports containing specific facts relating to the allegations and problems with the 'issuer-pays' model of rating." The court likewise held that the claimed violations of the TSA were also barred by the two-year statute of limitations applicable in such actions because Plaintiff was placed on inquiry notice of its claims well before September 15, 2009, and that the two purchases made in 2003 were also barred by the five-year statute of repose. This appeal followed.

## II. ISSUES

We consolidate and restate the dispositive issues on appeal as follows:

A.      Whether the trial court erred in finding that no genuine issue of material fact exists as to whether FCB had inquiry notice of its claims against FTN prior to September 15, 2008.

B.      Whether the trial court erred in finding that no genuine issue of material fact existed as to whether the applicable statutes of limitations were tolled due to fraudulent concealment.

C.      Whether the trial court erred in determining that knowledge is not required to trigger the statute of limitations applicable to claims for violations of the Tennessee Securities Act.

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

as a matter of law." Tenn. R. Civ. P. 56.04.

When a party moves for summary judgment but does not have the burden of proof at trial, the moving party must either submit evidence "affirmatively negating an essential element of the nonmoving party's claim" or "demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015). "[I]f the moving party bears the burden of proof on the challenged claim at trial, that party must produce at the summary judgment stage evidence that, if uncontroverted at trial, would entitle it to a directed verdict." *TWB Architects, Inc. v. Braxton, LLC*, 578 S.W.3d 879, 888 (Tenn. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986)).

When a party files and properly supports a motion for summary judgment as provided in Rule 56, the nonmoving party "'may not rest upon the mere allegations or denials of [its] pleading.'" *Rye*, 477 S.W.3d at 265 (quoting Tenn. R. Civ. P. 56.06). Rather, the nonmoving party must respond and produce affidavits, depositions, responses to interrogatories, or other discovery that "set forth specific facts showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06; *see also Rye*, 477 S.W.3d at 265. If the nonmoving party fails to respond in this way, "summary judgment, if appropriate, shall be entered against the [nonmoving] party." Tenn. R. Civ. P. 56.06.

We review a trial court's summary judgment determination de novo, with no presumption of correctness. *Rye*, 477 S.W.3d at 250. Therefore, "we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* In reviewing a summary judgment motion on appeal, "we are required to review the evidence in the light most favorable to the nonmoving party and to draw all reasonable inferences favoring the nonmoving party." *Shaw v. Metro. Gov't of Nashville & Davidson Cnty.*, 596 S.W.3d 726, 733 (Tenn. Ct. App. 2019) (citations and quotations omitted).

## IV. DISCUSSION

### A. & B.

This action, which is based upon the purchase of complex securities between 2003 and 2007, was initially filed on September 15, 2011. Plaintiff's common law claims of fraud, civil conspiracy, constructive fraud, negligent misrepresentation, and unjust enrichment are properly categorized as claims for injuries to personal property that must be filed within three (3) years from the accruing of the cause of action. *See* Tenn. Code Ann. § 28-3-105 (providing that actions for injuries to personal property "shall be commenced within [three] years from the accruing of the cause of action"). Accordingly,

such common law claims are barred by the applicable three-year statute of limitations if the claims accrued prior to September 15, 2008.

The parties agree that the discovery rule is applicable here in determining when the statute of limitations expired. Our Supreme Court explained its longstanding interpretation of the discovery rule as follows:

> [T]he discovery rule does not delay the accrual of a cause of action and the commencement of the statute of limitations until the plaintiff knows the full extent of the damages . . . or until the plaintiff knows the specific type of legal claim it has. The discovery rule is not intended to permit a plaintiff to delay filing suit until the discovery of all the facts that affect the merits of his or her claim.
>
> Under the current discovery rule, a cause of action accrues and the statute of limitations begins to run not only when the plaintiff has actual knowledge of a claim, but also when the plaintiff has actual knowledge of facts sufficient to put a reasonable person on notice that he [or she] has suffered an injury as a result of wrongful conduct. This latter circumstance is variously referred to as constructive notice or inquiry notice. Quoting the Iowa Supreme Court, we have explained that inquiry notice charges a plaintiff with knowledge of those facts that a reasonable investigation would have disclosed. . . . [O]nce a plaintiff gains information sufficient to alert a reasonable person of the need to investigate the injury, the limitation period begins to run.

*Redwing v. Cath. Bishop for Diocese of Memphis*, 363 S.W.3d 436, 459 (Tenn. 2012) (internal quotations and footnotes omitted). "It is not required that the plaintiff actually know that the injury constitutes a breach of the appropriate legal standard in order to discover that he has a 'right of action.'" *Carvell v. Bottoms*, 900 S.W.2d 23, 29 (quoting *Roe v. Jefferson*, 875 S.W.2d 653, 658 (Tenn. 1994)). "[T]he plaintiff is deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct." *Id.*

Here, the trial court found, inter alia, as follows:

> In light of the information publicly available, the [c]ourt finds that [Plaintiff] was not only placed on inquiry notice that it suffered an injury, but also that problems inherent with the "issuer-pays" model employed by [Defendant] were a source of that injury as alleged in the Amended Complaint.
>
> The amount of public information and industry reports available before [September 2008] discussing the problems with the "issuer-pays" model employed by the Rating Agencies and cited by FTN is extensive. The problems surrounding the "issuer-pays" model was a matter of public debate

following the passage of the Credit Rating Agency Reform Act of 2006, a comprehensive scheme designed to regulate these practices. These alleged conflicts were criticized, investigated, and discussed heavily by the press. On September 26, 2007, a committee of the U.S. Senate held a hearing addressing, among other things, the conflicts inherent with the "issuer pays" model used by the Rating Agencies. Not only were the Rating Agencies criticized, but they were under investigation by Congress, the SEC, the New York Attorney General, and the Ohio Attorney General, among others. Notably in its Amended Complaint, [Plaintiff] cites to the July 2008 SEC Report that details the problems with the Rating Agency conflicts. Thus, [Plaintiff] relies on documents published outside the limitations period to support its claim. Examining the facts in the light most favorable to [Plaintiff], the [c]ourt finds that [Plaintiff] was placed on inquiry notice at least upon the publication of the SEC Report published in July 2008, rendering this suit filed on September 15, 2011 untimely.

Plaintiff argues that the question of whether it was put on inquiry notice of its claims requires careful, fact-specific consideration of issues that may not be reasonably settled without posing such questions to a jury. Plaintiff further claims that the information available at the time contained conflicting information as to the cause of the decline in value of the investments and that such information did not specifically identify Defendant.

However, the 2008 SEC Report, cited by Plaintiff in the amended complaint, highlighted the problems inherent in the issuer pays model of rating securities utilized by Defendant and relied upon by Plaintiff. According to Plaintiff, "the Rating Agencies were typically engaged by way of 'ratings shopping,' whereby the Rating Agency that was ultimately engaged was the one that provided the most profitable rating to the investment bank in the bidding process for the engagement." Congressional hearings had also highlighted these same issues. The information publicly available to Plaintiff prior to September 15, 2008, considered along with the sharp decline in value of its own securities and the negative rating actions taken on such securities, was more than enough to provide Plaintiff with actual knowledge of facts sufficient to put a reasonable investor on notice that it had suffered an injury as a result of wrongful conduct. A reasonable and prompt investigation into the injury would have alerted Plaintiff to the obvious source of its injury, Defendant, i.e., the entity responsible for structuring, marketing, and selling the investments at issue. With all of the above considerations in mind, we uphold the trial court's finding that Plaintiff was placed on inquiry notice prior to September 15, 2008, thereby rendering Plaintiff's common law claims untimely filed beyond the applicable statute of limitations.

Plaintiff next argues that there remained genuine issues of material fact regarding whether Defendant fraudulently concealed its role in Plaintiff's injuries and whether such concealment could operate to toll the statute of limitations. Application of the fraudulent

concealment doctrine serves to toll the statute of limitations "until the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered the defendant's fraudulent concealment or sufficient facts to put the plaintiff on actual or inquiry notice of his or her claim." *Redwing*, 363 S.W.3d at 463. At that point, "the original statute of limitations begins to run anew, and the plaintiff must file his or her claim within the statutory limitations period." *Id.*

The elements of fraudulent concealment are:

(1) that the defendant affirmatively concealed the plaintiff's injury or the identity of the wrongdoer or failed to disclose material facts regarding the injury or the wrongdoer despite a duty to do so; (2) that the plaintiff could not have discovered the injury or the identity of the wrongdoer despite reasonable care and diligence; (3) that the defendant knew that the plaintiff had been injured and the identity of the wrongdoer; and (4) that the defendant concealed material information from the plaintiff by withholding information or making use of some device to mislead the plaintiff in order to exclude suspicion or prevent inquiry.

*Id.* at 462–63 (citations and quotations omitted). "Plaintiffs asserting the doctrine of fraudulent concealment . . . must demonstrate that they exercised reasonable care and diligence in pursuing their claim." *Id.* at 463. As stated previously, we hold once again that a reasonably diligent investor would have been put on notice of its claims under the circumstances presented here prior to September 15, 2008. This argument is without merit.

### C.

Plaintiff's claims against Defendant based upon violations of the TSA are subject to a two-year statute of limitations and a five-year statute of repose, pursuant to Tennessee Code Annotated section 48-1-122(h), which provides as follows:

No action shall be maintained under this section unless commenced before the expiration of five (5) years after the act or transaction constituting the violation or the expiration of two (2) years after the discovery of the facts constituting the violation, *or after such discovery should have been made by the exercise of reasonable diligence, whichever first expires*.

(Emphasis added). Accordingly, such claims are barred by the applicable two-year statute of limitations if the claims accrued prior to September 15, 2009, or by the applicable five-year statute of repose for any claims made five years after the transaction.

Citing *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010), Plaintiff argued before the

trial court and now on appeal that the language of the statute itself requires discovery of all of the facts necessary to support the cause of action. We, like the trial court, note that the circumstances presented in *Merck* involved the interpretation of a federal statute of limitations that contains materially different language regarding accrual. *Merck*, 559 U.S. at 650–51. The federal statute at issue in *Merck* provides as follows:

> (b) Notwithstanding subsection (a), a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of—
>
> (1) 2 years after the discovery of the facts constituting the violation; or
>
> (2) 5 years after such violation.

28 U.S.C. § 1658. The pertinent statute at issue in this action expressly incorporates the discovery rule, thereby rendering Plaintiff's claims that were not automatically barred by the five-year statute of repose untimely filed. As previously discussed, a reasonably diligent investor would have been put on notice of its claims under the circumstances presented here prior to September 15, 2008, and well before September 15, 2009.

## V. CONCLUSION

For the reasons stated above, we affirm the decision of the trial court. The case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, First Community Bank f/k/a First Community Bank, N.A.

_____
JOHN W. MCCLARTY, JUDGE