**Shelley Marlene SAMPSON, et al.**

v.

**WELLMONT HEALTH SYSTEM, dba Holston Valley Medical Center, et al.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Dec. 6, 2006 Session.

Jan. 31, 2007.

Permission to Appeal Denied by Supreme Court June 18, 2007.

Mark D. Harris, Kingsport, Tennessee, for the appellants, Shelley Marlene Sampson and Edward V. Sampson.

Russell W. Adkins, Kingsport, Tennessee, for the appellees, Wellmont Health System, dba Holston Valley Medical Center, and Elizabeth Perry, R.N.

## OPINION

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

This is a medical malpractice case. Shelley Marlene Sampson ("the plaintiff")[1] and her husband, Edward V. Sampson, sued the defendants, Wellmont Health System ("Wellmont"), doing business as Holston Valley Medical Center, and Elizabeth Perry, R.N. ("Nurse Perry"), alleging that the plaintiffs suffered damages as a result of Nurse Perry's failure to promptly check and empty the plaintiff's catheter bag during her postoperative stay at Holston Valley Medical Center. The trial court granted the defendants summary judgment, finding that the plaintiff's cause of action was filed outside the period of the applicable statute of limitations. We affirm.

### I.

On March 15, 2002, the plaintiff underwent a hysterectomy at Holston Valley Medical Center. Following the plaintiff's surgery, a Foley catheter was inserted into the plaintiff's bladder. At approximately 7:30 p.m. that evening, the plaintiff came under the care of Nurse Perry, a licensed registered nurse employed by Wellmont. Later the same evening, at approximately 10:40 p.m., the plaintiff's sister asked Nurse Perry when she was going to "check" the catheter bag. According to the plaintiff, Nurse Perry replied that she would empty the bag in a few minutes. The record is not clear as to whether Nurse Perry actually checked or emptied the catheter bag at that time. At approximately 2:15 a.m. the next morning, i.e., in the early morning hours of March 16, 2002, the plaintiff awoke and asked another nurse when the catheter bag would be emptied. The nurse informed the plaintiff that Nurse Perry had noted in the plaintiff's hospital chart that the bag was to be emptied at 3:00 a.m. The second nurse left the room, and the plaintiff went back to sleep.

---

1. As can be seen, there are actually two plaintiffs. However, the suit of one—Edward V. Sampson—is purely derivative in nature. For ease of reference, we will refer to the injured party—Shelley Marlene Sampson—as if she were the sole plaintiff.

At approximately 6:00 a.m. the same morning, the plaintiff awoke with terrible pain in her lower abdomen—a feeling as if she needed to empty her bladder. The plaintiff paged the nurse's station, and within seconds of the page, Nurse Perry entered the room and began emptying the catheter bag. The plaintiff states that, after Nurse Perry emptied the bag, the pressure and the feeling associated with having to urinate subsided. Around 9:30 a.m. the same day, the catheter was removed from the plaintiff's bladder. According to the plaintiff, "a pulsating, throbbing kind of hurt" persisted following the removal of the catheter. The plaintiff testified that she "really hurt" when she urinated.

The plaintiff was discharged from the hospital on March 18, 2002. Three or four days following the plaintiff's return home, the general intense pain and soreness caused by the surgical procedure began to subside. However, "a pulling, burning, stinging sensation" persisted when the plaintiff urinated. Around this time, the plaintiff started a handwritten narrative regarding her postoperative care at the hospital. She would later state that she prepared the narrative because she wanted to make sure she had a record of the treatment provided by the defendants. She particularly wanted a record of Nurse Perry's "attitude" and "demeanor." When later asked in her deposition if she felt a written record was necessary because she had experienced problems as a result of Nurse Perry's treatment, the plaintiff stated, "[e]motionally I was having serious problems because of the treatment." When further asked in her deposition if she felt her physical problems resulted from Nurse Perry's treatment, the plaintiff answered

I didn't know for sure. All I knew was I was having excruciating pain in my lower abdomen.

On March 20, 2002, the plaintiff called Barbara Gipe, a hospital advocate employed by Wellmont, to inform her regarding the treatment she had received at the hands of Nurse Perry. The plaintiff's handwritten narrative regarding her conversation with Ms. Gipe is dated "*3–20–02*," (emphasis added), and provides as follows:

I cld[2] Barbara Gipe w/patient relations. *I explained what happened in detail.*

(Emphasis added). The plaintiff's narrative then recites the following:

[Ms. Gipe] said she would give me the # and that Marsha Helton was over the OB/GYN Unit. (224–5180) I cld her and [sic] # and left a detailed msg.

The narrative groups this and the previous quote under the date of "3–20–02." The next entry in the narrative is dated "3–21–02" and is as follows:

[Elizabeth "Libbie" Dolen, clinical manager at Holston Valley] cld. She said shes [sic] the supervisor for OB/GYN. I explained everything to her. She said "If it had been any other nurse in that unit, this would have probably never happened" and if I have anymore [sic] problems to call "us" back.

(Underlining in the plaintiff's narrative).

The plaintiff was deposed by the defendants on March 15, 2004. As particularly pertinent to the issue on this appeal, the plaintiff testified as follows regarding her telephone conversation with Ms. Gipe, a conversation, which, according to both the plaintiff's deposition testimony and her written narrative, occurred on March 20, 2002:

---

**2.** This is apparently an abbreviation for      "called."

Q. Okay. What did you and Ms. Gipe discuss?

A. . . . I told [Ms. Gipe] . . . that I felt, because of this incident [*i.e.*, the incident with Nurse Perry and the catheter bag], that that's why I was having problems and that I felt they should have to pay for any, you know, doctor bills or prescriptions or anything like that that I would, you know, I would incur because of it.

Q. So whatever date these telephone calls happened, you at that time felt that the problems you were having resulted from overextension of your bladder from the Foley bag not being emptied. Is that correct?

A. Uh-huh (Yes.)

\* \* \*

Q. Okay. And tell me everything you remember discussing with Barbara Gipe.

A. I told her I wanted her to be aware of treatment that a nurse had given me or the lack thereof treatment; that she left me scared, frightened. She made me feel that she could have cared less what had happened to me. You know, she didn't check my vitals. You know, we would buzz her. She wouldn't come. She would just leave me laying for hours. She sent other people in when she was supposed to have come in. I just—I felt that she was not a good nurse and that someone in that hospital needed to be made aware of that.

Q. Did you think that her conduct was inappropriate?

A. Absolutely.

Q. Did you think that it was negligent?

A. Yes, absolutely.

Q. Did you tell Barbara Gipe that you were having pain with urination?

A. I told her that I was having very excruciating pain and including with urination.

Q. Did you tell her that because you felt that it was related to the treatment that you had received from the hospital?

A. I didn't know at that point.

Q. Did you tell her that?

A. I don't recall.

\* \* \*

Q. Did you describe terrible pain when you pee when you talked to Barbara Gipe?

A. I don't recall. Probably so. I mean that I hurt really bad. I'm sure that I told her that I was, you know, having a lot of pain.

During her deposition, the plaintiff described her telephone conversation with Libbie Dolen which, as previously noted, the plaintiff stated in her narrative occurred on March 21, 2002:

Q. Tell me everything you remember about that conversation.

A. There again, I went into detail about from the minute [Nurse Perry] walked into the room, you know, her overall, to me, negligent attitude; that they just—they needed to follow up. It's—you know, it's hard telling how many other people she let lay like that and neglected and not give adequate care to. You know, stuff like that bothers me.

Q. What did Libbie say?

A. She said something along the lines, and I put that in quotes [in my narrative], but she said something along the lines that she knew that if it had been any other nurse on that unit, that none of this would probably have ever happened.

Q. Did you say anything else about . . .

A. Not that I can, not that I can remember. And she was apologetic. You know, her tone, she was apologetic.

\* \* \*

Q. When you talked with Libbie on March 21st, did you tell her you were having terrible pain when you peed?

A. I may have. I don't really recall specifically. My concern was the negligence with the hospital. I mean just flat out just the way she let me lay, you know.

On March 28, 2002, the plaintiff visited her treating physician, Dr. Octavio Pinell, for her two-week postoperative visit. Dr. Pinell's records indicate that the plaintiff noted no major complaints during this visit. When asked in her deposition whether, during this visit, she and Dr. Pinell discussed the pain she was experiencing during urination, the plaintiff replied in the negative. She went on to state that "I just told him I still hurt really bad, and, of course, he told me that was normal after that kind of surgery and that it was going to take me a long time to get over it."

On April 15, 2002, the plaintiff went to Dr. Pinell's office for her one-month postoperative visit. During this visit, the plaintiff commented on the pain she was still experiencing, and how the pain seemed to be worse when she urinated. Stephanie Burks, a nurse practitioner in Dr. Pinell's office, communicated the plaintiff's problems to Dr. Pinell. According to the plaintiff, Ms. Burks told her that Dr. Pinell believed she was suffering from "over-distention" of the bladder. Ms. Burks asked, "[d]id something happen?" The plaintiff then told Ms. Burks about Nurse Perry and the incident with the catheter bag. Ms. Burks reportedly replied, "Well, we think you're having spasms in your bladder because it was so badly stretched."

The plaintiff filed her complaint on April 14, 2003, within one year of her second postoperative visit to Dr. Pinell's office, but obviously more than one year from the date of March 20, 2002, when she spoke to Ms. Gipe. The complaint alleges that Nurse Perry was negligent in failing to empty the Foley catheter "from the time it was inserted until the following morning and as a result thereof, [the plaintiff's] bladder was stretched resulting in the plaintiff having bladder spasms, incontinence, permanent pain and discomfort." As to Wellmont, the plaintiff alleges negligence in that it (1) failed to properly monitor the plaintiff following her surgery; (2) failed to implement sufficient policies to assure that patients are properly cared for; (3) failed to supervise its agents and employees; and (4) failed to properly train its agents and employees. The complaint asserts that the plaintiff suffered both emotional and physical injuries as a proximate result of the defendants' negligent acts. The complaint further claims that the plaintiff's husband was deprived of the plaintiff's services and consortium.

On May 7, 2003, the plaintiff filed an amendment to her complaint, adding the following language:

> It is the plaintiff's position that she did not discover that she had been injured nor did she have reason to know that she had been injured as a result of the negligent acts herein-after [sic] complained of until she was so informed by her physician [on April 15, 2002] and that she relies on the doctrine of discovery as it relates to this particular act.

The defendants filed a motion for summary judgment based upon the one-year statute of limitations set forth at T.C.A. § 29–26–116 (2000).[3] Without admitting that the plaintiff sustained an injury as a

---

**3.** The relevant portion of T.C.A. § 29–26–116 provides that "[t]he statute of limitations in malpractice actions shall be one (1) year as set forth in [T.C.A.] § 28–3–104 [*i.e.*, the one-year statute of limitations for 'injuries to the person']." *Id.* at (a)(1).

result of the defendants' negligence, the defendants contend that the plaintiff was, or should have been, aware of her injury more than one year before she filed suit on April 14, 2003. In support of the motion, the defendants filed a statement of undisputed material facts citing the plaintiff's deposition testimony.

In response to the defendants' motion, the plaintiff filed her affidavit, in which she states, in pertinent part, as follows:

I have reviewed portions of my discovery deposition taken March 15, 2004 and here state that the interpretation of handwritten note[s] attached to my deposition ... by counsel for Defendant in their Statement of Material Facts is not correct concerning dates associated with events described in those notes. I would here also state that several of my answers, as transcribed in my deposition to questions concerning dates associated with events described in my handwritten notes were not correct and/or mis-interpreted....On page 5 [of the transcript of my deposition, the defendants' attorney] asked me the following question:

Q. Are you taking any medications today that might cloud your judgment or make it hard for you to understand my questions and give a clear answer?....

I answered [the attorney's] question with an unequivocal "yes". As follow-up I explained I was taking Oxitrol, Ambien and Loratab, all of which when taken alone or in combination have affected my perception and understanding and my mental abilities, especially memory, in profoundly negative ways. There is no question in my mind that my perception, judgment and ability to answer [the attorney]'s questions on March 15, 2004, was impacted by medication to the point that I should not have been giving a deposition requiring detailed recollection of facts and events. My answers to [the] question ... stating, "yes" to my being able to understand what [the defendants' attorney] was asking me and my feeling I could go through with the deposition is a clear example of my impaired judgment especially in view of the fact I was taking medications with the known side effect of degrading mental function. I would here call attention to my answers to questions ... which comport well with the facts surrounding the discovery on April 15, 2002 that I had sustained injury as a result of the treatment and care of [Nurse] Perry [ ]. Thereafter, during the course of the deposition my answers pertaining to dates and substance of discussions with hospital personnel are not as accurate a reflection of those discussions as ... my handwritten notes, which were made on or near the different dates stated in those notes for particular entries.

... The description ... of my telephone call to ... Barbara Gipe on March 20, 2002 is inaccurate. During that telephone call, I did not mention having sustained an overextended bladder injury as a result of the treatment and care administered to me by [Nurse] Perry[ ]. During that telephone conversation with Barbara Gipe I did not tell her I was having physical problems because of the catheter incident nor did I say [Wellmont] should pay for any doctor bills or expenses that I would incur that were caused by it. Those comments were actually made to Marsha Helton with the OB/GYN unit during a telephone conversation that occurred on April 15, 2002, after I had been diagnosed earlier that day by Nurse Burks as having an overextended bladder and spasms resulting from the incident. My notes clearly show this. I believe my confusion during the deposition regarding the dates and substance of conversations to

be the result of an impaired state of mind on that day caused largely by the influence of prescribed medication I had taken. My complaints to Barbara Gipe regarding [Nurse] Perry concerned her demeanor and cavalier and neglectful manner toward my care. She first introduced herself to me as the "coma nurse". She would not come when I buzzed her, sending others instead. My reason for calling Barbara Gipe was to tell her I felt [Nurse] Perry was not a good nurse and that someone in the hospital needed to be made aware of that. [Nurse] Perry made me feel that she could have cared less when [sic] happened to me. When asked by [the defendants' attorney] whether I thought [Nurse] Perry was negligent, I answered, "Yes, absolutely", in reference to her careless and neglectful approach to my care and treatment. . . . I am not qualified to express an opinion as to the legal standard of care for nurses in the Kingsport locality and when [the defendant's attorney] asked me questions about [Nurse] Perry being negligent I was not expressing a professional opinion in those terms, but instead expressing a personal opinion in terms of her bad attitude and approach to my care and treatment which I considered to be neglectful. I did not connect her actual care and treatment of me to the diagnosis of overextended bladder until I was seen by Nurse Burk[s] on April 15, 2002 when I was told by her that the source of my pain was from an overextended bladder and Nurse Burk[s] asked if something had happened that could have caused the injury. The pain I was experiencing up until the time I made the appointment to see Nurse Burk[s] I had associated with post-operative recuperation, including painful urination. However, as the general pain subsided and I noticed the greater and more specific pain during urination. Around the time I made the appointment through Dr. Pinell's office in April 2002, I thought my problems were not from the surgery alone but the results of a urinary tract infection requiring treatment. I did not connect the pain during urination with the care and treatment given me by [Nurse] Perry until April 15, 2002, the date I discovered I was injured based upon what Nurse Burk[s] advised me.

(Underlining in original; paragraph numbering in original omitted).

The trial court entered an order granting the defendants *partial* summary judgment, holding that the record before the court demonstrated that the plaintiff's claim for *emotional* injury was barred by the one-year statute of limitations. The trial court then denied the motion with respect to the remaining allegations of the complaint.

Shortly thereafter, the defendants restated their motion for summary judgment, this time attaching, and relying upon, an affidavit executed by Libbie Dolen. Contrary to the plaintiff's deposition and narrative, Ms. Dolen's affidavit states that her telephone conversation with the plaintiff occurred on April 3, 2002, not on March 21, 2002. However, in the context of the issue in this case, this disputed fact is not material because—to the extent the plaintiff's conversation with Ms. Dolen is relevant—both dates are more than one year *before* the plaintiff filed her suit.

Ms. Dolen's affidavit explains that she telephoned the plaintiff after being told by Ms. Gipe that the plaintiff had complaints regarding her recent hospitalization. Ms. Dolen's affidavit provides the following additional information regarding her conversation with the plaintiff:

[The plaintiff] told me that she had surgery on March 15, 2002 and that she was

returned to her room at 2:15 p.m. but that her vital signs were not checked between 2:15 p.m. and 8:00 p.m.

[The plaintiff] also related that she complained at 10:00 p.m. of her feet burning and of feeling nauseated. She said that she requested medication at that time, but that her request had not been addressed about ten or fifteen minutes later, so her sister came to the nurses' desk and observed the nurses laughing and talking.

[The plaintiff] related that her PCA alarm went off at 12:22 a.m., and that she was cold. She said a different nurse came in and refilled her pump and brought her a warm blanket. She described the other nurse as very nice. She related that she then woke up later and was "hurting bad" with pressure like she needed to void. She said that she pressed the call light and [Nurse] Perry came right in and emptied her Foley bag. [The plaintiff] told me that [Nurse] Perry drained three full Specipans from the bag.

[The plaintiff] also complained that [Nurse] Perry had introduced herself as the "coma nurse", and had told her that if patients give her a hard time, she was sure to take away their pain pump early. She described [Nurse] Perry as having a bad attitude.

[The plaintiff] told me that she had seen Dr. Pinell one week previously, and that she still had pain from her bladder in a straight line up to her umbilicus. She told me that she felt this was due to her Foley bag getting so full while she was hospitalized.

(Paragraph numbering in original omitted). The plaintiff filed a verified response (1) stating that she did not recall having a conversation with Ms. Dolen on April 3, 2002, "or ever," (2) disputing each fact testified to by Ms. Dolen in her affidavit,

and (3) generally denying that, prior to April 15, 2002, she had told anyone that she believed her persisting pain was a result of Nurse Perry's treatment.

The trial court subsequently entered an order granting the defendants summary judgment. The court's order provides as follows:

[The plaintiff] underwent a hysterectomy at Wellmont Holston Valley Medical Center ("Wellmont") on March 15, 2002. She was discharged from Wellmont on March 18, 2002. According to [the p]laintiff's own testimony, she was hurting so badly while in the hospital that she could hardly stand it. On March 20, 2002, she began constructing a written record. At that time, she felt that she had serious problems because of her treatment by [Nurse] Perry. Also on March 20, 2002, [the p]laintiff called Barbara Gipe at Wellmont and complained of Nurse Perry's misconduct. [The p]laintiff told Ms. Gipe at that time that she believed Nurse Perry's conduct was inappropriate and negligent, and that she believed she had problems from the Foley catheter. She also told Ms. Gipe that she felt that the hospital should pay her medical bills and expenses. Ms. Gipe gave [the p]laintiff the telephone number of another hospital representative named Marsha Helton, and [the p]laintiff left a message for Ms. Helton on March 20, 2002.

On April 3, 2002, Elizabeth Dolen called [the p]laintiff. [The p]laintiff told Ms. Dolen that she felt the Foley catheter was the cause of her pain. [The p]laintiff filed this action on April 14, 2003. [The p]laintiff's discovery deposition was taken on March 15, 2004. On April 7, 2004, [the p]laintiff reviewed and signed her discovery deposition. Later realizing that her testimony foreclosed her cause of action, [the p]laintiff contradict-

133

ed her earlier testimony by Affidavit. The Court finds that Affidavit testimony to be untruthful, in light of [the p]laintiff's earlier sworn deposition testimony. Viewing the evidence in the light most favorable to [the p]laintiff, the Court finds that reasonable minds cannot differ that [the p]laintiff knew or should have known that her alleged treatment was improper, and that she suffered injury as a result. Therefore, this Court finds that there is no genuine issue of material fact, and that [the d]efendants are entitled to Judgment as a matter of law pursuant to Rule 56 of the Tennessee Rules of Civil Procedure and the one-year statutes of limitation, Tenn. Code Ann. §§ 29–26–116 and 28–3–104. From this judgment, the plaintiff appeals.

## II.

In deciding whether a grant of summary judgment is appropriate, courts must determine "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. Courts "must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Byrd v. Hall*, 847 S.W.2d 208, 210–11 (Tenn.1993) (citations omitted). Summary judgment should be granted "when both the facts and the conclusions to be drawn from the facts permit a reasonable person to reach only one conclusion." *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995) (citation omitted). Since a motion for summary judgment presents a pure question of law, our review of a grant of summary judgment is *de novo* with no presumption of correctness as to the trial court's judgment.

*Gonzales v. Alman Constr. Co.*, 857 S.W.2d 42, 44–45 (Tenn.Ct.App.1993). The only evidence that can be considered in the summary judgment analysis is evidence that would be admissible at trial. *Byrd*, 847 S.W.2d at 215–16.

## III.

■ The issue before us in this summary judgment case is a narrow one: Is there a genuine issue of material fact as to when the plaintiff was first aware of facts sufficient to put a reasonable person on notice that she had been injured as a result of another's wrongful conduct? The defendants contend, and the trial court agreed, that the only facts properly before the court showed that the plaintiff was possessed of the requisite knowledge at a point in time more than one year prior to the date of the filing of her complaint. The plaintiff, on the other hand, argues that she first became aware of an injury due to the defendants' wrongful conduct on April 15, 2002–less than one year prior to the filing of the complaint on April 14, 2003–when Dr. Pinell told her, through his nurse practitioner, Stephanie Burks, that she was having bladder spasms as a result of a "badly stretched" bladder.

## IV.

### A.

As previously noted, the plaintiff gave a deposition in this matter on March 15, 2004. At the outset of the plaintiff's deposition, immediately following the discussion of what medications the plaintiff was taking at the time of the deposition, the defendants' attorney asked the plaintiff whether she felt she would be able to understand his questions, and whether she felt that she could "go through with this." The plaintiff responded, "Yes." As a follow-up, the defendants' attorney stated

that the plaintiff should let him know if, at any time during the deposition, she felt she was having problems communicating. The attorney then stated, "if we go forward, I'm going to assume that you have understood my questions and the answers you've given are ones that you're going to stick with throughout this litigation." The plaintiff replied, "Okay." After the plaintiff's deposition was transcribed, she was given the opportunity to review the transcript of her testimony and make changes. See Tenn. R. Civ. P. 30.05. She reviewed the transcript and signed it without making any changes or calling attention to any inaccuracies.

Tenn. R. Evid. 601 provides that "[e]very person is presumed competent to be a witness except as otherwise provided in these rules or by statute." See also Anderson v. Chattanooga Gen. Servs. Co., 631 S.W.2d 380, 382 (Tenn.1981).

### B.

■■ The arguments in this case bring into sharp focus what has come to be known as the "discovery rule,"[4] a rule which provides that "the statute of limitations commences to run when the [plaintiff] discovers, or in the exercise of reasonable care and diligence for his own health and welfare, should have discovered the resulting injury." Teeters v. Currey, 518 S.W.2d 512, 517 (Tenn.1974). The discovery rule serves as a shield to a limitations defense only when the plaintiff does not discover or could not have reasonably discovered that he or she had a cause of action. Woods v. Sherwin–Williams Co., 666 S.W.2d 77, 80 (Tenn.Ct.App.1983). "[A] plaintiff need not actually know the specific type of legal claim he or she has so

long as the plaintiff is 'aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct.' " Stanbury v. Bacardi, 953 S.W.2d 671, 678 (Tenn.1997) (quoting Roe v. Jefferson, 875 S.W.2d 653, 657 (Tenn.1994)).

### C.

■■ If the plaintiff's deposition testimony of March 15, 2004, "stands" without being properly disputed, it is clear that the plaintiff, on March 20, 2002, was "aware of facts sufficient to put a reasonable person on notice that [she] ha[d] suffered an injury as a result of wrongful conduct." Roe, 875 S.W.2d at 657. She testified in that deposition that she "absolutely" thought that Nurse Perry's conduct was both "inappropriate" and "negligent." She also answered "Uh-huh (Yes)" when asked if, as of the date of the telephone conversation with Ms. Gipe, she "felt that the problems [she was] having resulted from overextension of [her] bladder from the Foley bag not being emptied." According to the plaintiff's deposition testimony and written narrative, this conversation occurred on March 20, 2002, more than one year before she filed suit. Thus, even if we ignore the sworn testimony of the defendant Wellmont's employee, Libbie Dolen, the plaintiff's deposition testimony-again if it is not properly contradicted—conclusively establishes a "discovery" date of no later than March 20, 2002, thus rendering the plaintiff's filing of suit on April 14, 2003, outside the one-year period of the applicable statute of limitations.

■■ The plaintiff strongly urges—despite her deposition testimony and the contents of her written narrative-that her

---

4. The codified version of the discovery rule, which is found at T.C.A. § 29–26–116(a)(2), provides as follows: "[i]n the event the alleged injury is not discovered within such one

(1) year [statute of limitations] period, the period of limitation shall be one (1) year from the date of such discovery."

later-filed affidavit establishes a genuine issue of material fact as to when she had the requisite knowledge to start the running of the limitations period. If she is correct, summary judgment is not appropriate. While the trial court found the affidavit "to be untruthful," this was not the lower court's "call." On summary judgment—being a proceeding strictly "on the papers"—testimony cannot be disregarded on the basis of a lack of credibility. *Byrd*, 847 S.W.2d at 212, 216. Thus, the rationale of the trial court for disregarding the affidavit was clearly erroneous. However, it remains to be seen if the affidavit can be disregarded on other grounds.

### D.

■ Tennessee recognizes that a witness can affirm a fact and later contradict that fact provided—and this is critical— the witness offers an explanation for the inconsistency. *See Helderman v. Smolin*, 179 S.W.3d 493, 502 (Tenn.Ct.App.2005). The authors of *Federal Practice and Procedure* have addressed conflicts between deposition testimony and a later-filed affidavit:

> Although some courts have ruled that conflicts between depositions and later-filed affidavits present questions of credibility, precluding summary judgment, several courts have suggested that summary judgment may be granted under those circumstances, or that the affidavit may be disregarded or stricken as sham.

10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2726, at 448–50 (3d ed.1998) (footnotes omitted). However, the authors go on to state that

> [i]t seems quite clearly correct to conclude that an interested witness who has given clear answers to unambiguous questions cannot create a conflict and resist summary judgment with an affida-

vit that is clearly contradictory, without providing a satisfactory explanation of why the testimony is changed. If such an explanation is proffered, a credibility question is presented; without it, there are no facts suggesting why a credibility question exists and the nonmoving party should not be allowed to manufacture a question of fact to delay resolution of the suit.

*Id.*, at 452 (footnotes omitted).

### E.

Breaking the issue in this case down further, we are left with two questions: First, does the plaintiff's affidavit contradict her deposition testimony as to when she first had knowledge of injury caused by wrongful conduct, and, second, has the plaintiff offered—in the words of the federal treatise—a "satisfactory explanation of why the testimony is changed"? *Id.* We now turn to the plaintiff's later-filed affidavit in an attempt to answer these two questions.

### F.

### 1.

The plaintiff's deposition testimony and written narrative date her conversation with Barbara Gipe as having occurred on March 20, 2002. The plaintiff's affidavit is consistent with these two documents as to the date of that conversation. Furthermore, in both her deposition testimony and her affidavit, the plaintiff says she was taking medications, Oxitrol, Ambien, and Lortab, at the time she was deposed. No contradiction there. However, there is a critical contradiction between the deposition testimony and the affidavit as it pertains to the *content* of the plaintiff's conversation with Ms. Gipe on March 20, 2002. Contrary to the plaintiff's deposition testimony, the plaintiff says in her affidavit that

... [t]he description ... of my telephone call to ... Barbara Gipe on March 20, 2002 is inaccurate. During that telephone call, I did not mention having sustained an overextended bladder injury as a result of the treatment and care administered to me by [Nurse] Perry[ ]. During that telephone conversation with Barbara Gipe I did not tell her I was having physical problems because of the catheter incident nor did I say [Wellmont] should pay for any doctor bills or expenses that I would incur that were caused by it.

(Underlining in original). The plaintiff says in her affidavit that "[t]hose comments were actually made to Marsha Helton with the OB/GYN Unit during a telephone conversation that occurred on April 15, 2002, after I had been diagnosed earlier that day by Nurse Burk[s] as having an overextended bladder and spasms resulting from the incident." Thus, if the affidavit is correct on this point, the critical date as to when the plaintiff discovered she had been injured as a result of the wrongful conduct of the defendants arguably would be April 15, 2002. If April 15, 2002, is the date of discovery, a suit filed on April 14, 2003, would be timely and summary judgment would be inappropriate.

In her affidavit, the plaintiff states that her narrative "clearly shows" that the conversation she supposedly had with Ms. Gipe on March 20, 2002, was, instead, her conversation with Marsha Helton on April 15, 2002. Here is what the narrative says with respect to Ms. Helton:

I cld Marsha Helton again—l[e]ft msg— told her I was having severe spasms. I told her that I felt [Holston Valley Medical Center] should be responsible for Meds, Drs bill and anything else that may come up from this. She didn't call me back. 04–16–02 I cld M. Helton again at 1:55. She said she was turning

it over to Justine Hill w/ Risk Management. She was supposed to call me back on 04–17–02. 04–22–A rep for Risk Management cld to say that As [sic] a good will [sic] gesture-they would reimburse me for my Drs co-pay $20.00 & my prescription for $20.00. I told her this had nothing to do w the $. I told her that Elizabeth Perry could really hurt someone.

Contrary to the plaintiff's assertion in her affidavit, we do not find that her narrative "clearly shows" that her first complaint to someone at Holston Valley Medical Center about an injury due to the wrongful conduct of Nurse Perry was in "a telephone conversation [with Marsha Helton] that occurred on April 15, 2002." The narrative does not reflect a "telephone conversation" with Martha Helton on this date. Rather, the narrative recites that the plaintiff called Ms. Helton on April 15, 2002, and "left msg." The narrative does show that the plaintiff talked to Ms. Helton on April 16, 2002, but it does not reflect what the plaintiff told her. However, liberally construing the narrative in the plaintiff's favor, we conclude that it does reflect that the plaintiff talked to Ms. Helton soon after the plaintiff had her significant conversation with nurse practitioner Stephanie Burks in Dr. Pinell's office. Any discrepancy between the affidavit and the narrative goes to the issue of weight to be given to the plaintiff's testimony. This is not an issue to be resolved on summary judgment.

In summary, it is clear that the plaintiff's affidavit does contradict her deposition testimony on the critical point of what she told Ms. Gipe on March 20, 2002. The affidavit, if taken at face value and if believed, would establish April 15, 2002, as the date of discovery.

### 2.

The question that remains is whether the affidavit provides a "satisfactory explanation of why the testimony is changed." 10A Charles Alan Wright, et al., *Federal Practice and Procedure* § 2726, at 452.

The pertinent parts of the affidavit on this subject are as follows:

I would here also state that several of my answers, as transcribed in my deposition to questions concerning dates associated with events described in my handwritten notes were not correct and/or mis-interpreted. . . . On page 5 [of the transcript of my deposition, the defendants' attorney] asked me the following question:

Q. Are you taking any medications today that might cloud your judgment or make it hard for you to understand my questions and give a clear answer?

. . .

I answered [the attorney's] question with an unequivocal "yes". As follow-up I explained I was taking Oxitrol, Ambien and Loratab, all of which when taken alone or in combination have affected my perception and understanding and my mental abilities, especially memory, in profoundly negative ways. There is no question in my mind that my perception, judgment and ability to answer [the attorney]'s questions on March 15, 2004, was impacted by medication to the point that I should not have been giving a deposition requiring detailed recollection of facts and events. My answers to [the] question . . . stating, "yes" to my being able to understand what [the defendants' attorney] was asking me and my feeling I could go through with the deposition is a clear example of my impaired judgment especially in view of the fact I was taking medications with the known side effect of degrading mental function. I would here call attention

to my answers to questions . . . which comport well with the facts surrounding the discovery on April 15, 2002 that I had sustained injury as a result of the treatment and care of [Nurse] Perry [ ]. Thereafter, during the course of the deposition my answers pertaining to dates and substance of discussions with hospital personnel are not as accurate a reflection of those discussions as . . . my handwritten notes, which were made on or near the different dates stated in those notes for particular entries.

\* \* \*

I believe my confusion during the deposition regarding the dates and substance of conversations to be the result of an impaired state of mind on that day caused largely by the influence of prescribed medication I had taken.

██ It is clear that the plaintiff by her affidavit is *attempting* to establish an explanation for changing her damaging deposition testimony with respect to what she told Ms. Gipe on March 20, 2002. Her explanation focuses on the fact that she was taking "Oxitrol, Ambien and Loratab." Her deposition testimony is to the effect that she was taking them as of "today," *i.e.*, the date of her deposition. Certainly, the plaintiff could state what medications she was taking at the time of the deposition. This testimony concerns a fact and is permissible testimony for a lay person. However, what is not proper is for the plaintiff—a lay person—to express an opinion as to the effects of such medication on her "perception and understanding and [her] mental abilities." This is a medical opinion and, if it is to be given, must be testified to by a competent professional. *See Butler v. State*, M2004–01543–CCA–R3–PC, 2006 WL 2206081, at \*6 (Tenn. Crim.App., filed July 31, 2006). Since the plaintiff was not competent to opine as to

the effects of these medications, her testimony on this subject would be inadmissible at trial and hence cannot be considered in a summary judgment analysis. *Byrd*, 847 S.W.2d at 215–16.

■ The plaintiff states in the affidavit her "belie[f]" that the taking of the medications caused "confusion during the deposition regarding the dates and substance of conversations." Tenn. R. Civ. P. 56.06 "makes it clear ... that ... affidavits 'shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" *Keystone Ins. Co. v. Griffith*, 659 S.W.2d 364, 365 (Tenn.Ct.App.1983). *See also Fowler v. Happy Goodman Family*, 575 S.W.2d 496, 498 (Tenn.1978). A "belie[f]" does not fall within the type of testimony contemplated by Tenn. R. Civ. P. 56.05. *Id.* The rule requires the recitation of *facts* "on personal knowledge." *Id.* In summary, we cannot consider, on this summary judgment analysis, the plaintiff's affidavit with respect to her assertions regarding the effects of the medications she was taking or her "belie[fs]" as to various things.

When the plaintiff's affidavit is reduced to its core assertions on the "explanation" question, we are left with no admissible testimony to support the plaintiff's position that she has offered a satisfactory explanation for the change in her deposition testimony regarding the content of her telephone conversation with Ms. Gipe on March 20, 2002. In the absence of a satisfactory explanation for this change in testimony, we are justified in ignoring the affidavit. This means the deposition testimony stands and conclusively establishes that by no later than March 20, 2002, the plaintiff was "aware of facts sufficient to put a reasonable person on notice that [s]he has suffered an injury as a result of wrongful conduct." *Roe*, 875 S.W.2d at 657.

■ In her affidavit, the plaintiff attempts to distance herself from her deposition testimony that she believes that Nurse Perry's conduct was negligent. She asserts she is not competent to express an opinion as to the standard of care for a nurse. We agree she is not competent to express such an opinion. However, this misses the point. The plaintiff testified in her deposition that Nurse Perry's treatment was "inappropriate." It is abundantly clear from the deposition testimony that as of March 20, 2002, the plaintiff was aware of Nurse Perry's *wrongful conduct* in handling her Foley catheter. This is enough. As the Supreme Court said in *Roe*, 875 S.W.2d at 657,

[i]t is not required that the plaintiff actually know that the injury constitutes a breach of the appropriate legal standard in order to discover that he has a "right of action"; the plaintiff is deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct.

### V.

In summary, we hold that the plaintiff's deposition testimony regarding her March 20, 2002, conversation with Ms. Gipe stands unrefuted. That testimony shows that by a point in time not later than March 20, 2002, the plaintiff was aware of facts sufficient to put a reasonable person on notice of an injury resulting from another's wrongful conduct. Thus, the suit filed on April 14, 2003, was untimely and is barred by the applicable statute of limitations.

## VI.

The judgment of the trial court is affirmed. This case is remanded to the trial court for collection of costs assessed there, pursuant to applicable law. Costs on appeal are taxed to Shelley Marlene Sampson and Edward V. Sampson.